## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL INDICTMENT** |
| **v.** | : | **NO. 1:13-CR-158-ODE/AJB** |
| | : | |
| **FRANCISCO CHAIDEZ-REYES,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant Francisco Chaidez-Reyes' motion to suppress evidence and statements.  [Doc. 14].[1]  After an evidentiary hearing, [Doc. 26 (hereinafter "T__")], the parties filed briefs.   [Docs. 28, 35 (Govt.), 32 (Chaidez)].  For the following reasons, the undersigned **RECOMMENDS** that the motion be **GRANTED IN PART and DENIED IN PART**.  Specifically, the Court **RECOMMENDS** that the motion be **GRANTED** as to Chaidez's November 30, 2012, statements as to why he was in the backyard of 4115 Flat Shoals Road and the location of currency in his residence and **DENIED** in all other respects.

---

[1]      The pending indictment charges Chaidez with possession of a firearm by an alien unlawfully in the United States, (Count One); possession with intent to distribute at least 100 kilograms of marijuana, (Count Two); and reentry by an alien into the United States without permission after having been removed, (Count Three). There also is a forfeiture provision.  [Doc. 1].

AO 72A
(Rev.8/8
2)

**Evidentiary Hearing Facts**

Homeland Security Investigations ("HSI") agents and local law enforcement officers were conducting a drug investigation in East Point, Georgia, in November 2012, and during the course of that investigation they suspected that thirty pounds of methamphetamine were being stored at 4115 Flat Shoals Road in Union City, Fulton County, Georgia. T4-5. On November 29, 2012, a cooperating defendant made monitored telephone calls to an unidentified person at that location in an effort to order a quantity of methamphetamine. T5; Deft. Ex. 1 at 11. After several telephone calls, a Mercury Marquis was seen leaving the residence. A Georgia State Patrol trooper stopped the vehicle for having an invalid license plate, and a search of the vehicle revealed approximately one-half pound of methamphetamine. T5. The driver, Sergio Armenta, was arrested. Local officers then obtained a state search warrant at 9:01 p.m. for the entire premises and curtilage of 4115 Flat Shoals Road. T6, 37; Govt. Ex. 1.

Federal and state officers executed the warrant beginning at 11:30 p.m. with initial entry by a SWAT team. Once the residence was declared secure, the search began at 12:05 a.m. on November 30, and it resulted in the discovery and seizure of over thirty pounds of methamphetamine and a firearm. T38, 148.

2

Fulton County Deputy Sheriff Farrar was one of the local officers providing security at the residence while the search was conducted. T53. Approximately one and one-half hours into the search, Farrar saw a light shining in the backyard and, along with other officers, went to the backyard to determine the source of the light. T53-54, 65. There, they discovered Defendant Chaidez sitting on the ground under a tree in the backyard. T54, 56, 66; Govt. Ex. 5. The officers, with their weapons drawn, ordered Chaidez to lay flat on the ground and handcuffed him. T57, 66-67. As Chaidez was lifted onto his feet, the officers saw a loaded firearm where Chaidez had been sitting. T57, 75; Govt. Exs. 6, 7. Farrar illuminated the weapon with his flashlight and saw that the serial number had been scratched off of the firearm. T58, 67; Govt. Ex. 6. Chaidez was searched, and the officers seized a cell phone, his wallet, $2500 in currency, and keys (which subsequently were found to open the door locks of 4115 Flat Shoals Road). T58-59. A flashlight also was located. T154.

Farrar then asked Chaidez, in English, what he was doing in the backyard. Chaidez replied that he lived a couple of doors down, and that he received a phone call from another person advising him that someone was in the house, so he came to check. T59-60, 68. Farrar described Chaidez's English as "pretty good." T60.

3

Chaidez was taken inside 4115 Flat Shoals Road and seated on the floor of the living room. T60, 68, 78. Chaidez's cell phone was searched by reviewing its call log and contact list, and the call log reflected that Chaidez had received telephone calls on November 29 from Armenta after Armenta spoke with the cooperator about ordering methamphetamine. T116-17, 119, 155.[2, 3] Inspecting Chaidez's cell phone also provided its phone number ot law enforcement. T155.[4, 5]

_____

[2]     Armenta's cell phone later was searched pursuant to a search warrant and showed calls to Chaidez's phone. T117.

[3]     The government is seeking to admit at Chaidez's trial the fact that multiple phone calls were made between Armenta and Chaidez's phones. T118. The government is not seeking to introduce evidence about the contact list from Chaidez's cell phone. T121.

[4]     The evidence shows that the cell phone was accessed at sometime between the time that Chaidez was taken into 4115 Flat Shoals Road and it was inventoried along with other evidence seized in the searches of both 4115 and 4135 Flat Shoals Road. Govt. Ex. 3; T117, 156.

[5]     The cell phone was not in Chaidez's name. T118. Courts have determined that a person does not have a legitimate expectation of privacy in cell phones that are not in the individual's name. *See United States v. Sereme*, No. 2:11-CR-97-FtM-29SPC, 2012 WL 1757702, at *9 (M.D. Fla. Mar. 27, 2012) (noting in dicta that an individual does not have a privacy interest in a cell phone that was not registered in his name or used by him); *United States v. Suarez-Blanca*, No.1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *7 (N.D. Ga. Apr. 21, 2008) (collecting cases finding an individual who is not linked to the subscriber of a cell phone has no legitimate privacy interest in that phone); *United States v. Solomon*, No. 02:05-cr-385, 2007 WL 927960, at *3 (W.D. Pa. Mar. 26, 2007) (finding no expectation of privacy in cellular telephone number because it was not registered in defendant's name, defendant was not listed as

4

Approximately fifteen to twenty minutes after Chaidez first was encountered in the backyard, HIDTA Task Force Officer Hannan asked Chaidez where he lived, and Hannan knew that Chaidez's response—4135 Flat Shoals Road—was within a short walking distance from 4115 Flat Shoals Road.  T71, 80.  In response to additional questioning, Chaidez stated that he lived with his wife and child and that someone was currently at his home.  Hannan asked Chaidez if he would consent to a search of his house at 4135 Flat Shoals Road, and Chaidez stated that he would consent.  T80.  The conversation was in English, and Chaidez stated he understood Hannan's questions. T80, 86.  Chaidez expressed concern about his family, and Hannan responded that they

---

an authorized user, and the subscriber of the phone was listed as another individual). *But see United States v. Finley*, 477 F.3d 250, 258-59 (5th Cir. 2007) (defendant had expectation of privacy to challenge search of cell phone where even though employer issued cell phone to defendant, defendant maintained a property interest in the phone, had a right to exclude others from using it, exhibited a subjective expectation of privacy in it, and took normal precautions to maintain his privacy in the phone).

Because the government did not challenge Chaidez's standing to challenge the search of the cell phone, the Court assumes that Chaidez has a sufficient expectation of privacy in the device and proceeds to decide the issues surrounding the search of the cell phone on the merits.

5

were not interested in his family, but only if there was "anything in the house that's not supposed to be there, any drugs or large sums of currency." T81.[6]

Hannan obtained a consent-to-search form (in English) from Farrar. T93. Hannan read the form aloud while Chaidez looked on. T94. On the consent form, Hannan entered his name, the address to be searched, and his badge number, and he checked the boxes delineating topics of advice,[7, 8] while Chaidez signed the form and

---

[6] There also is evidence that Chaidez wanted to take officers to his home to prove that he did not live at 4115 Flat Shoals Road. T154. Even if that was true, it would not change the Court's conclusion *infra* that Chaidez voluntarily consented to a search of his residence.

[7] The consent-to-search form provided, in material part:

Fulton County Sheriff's Office
**Consent to Search Form**

Case # _____
Citation # _20121001860_

I have been asked by _____*Mike Hannan*_____, a deputy with the Fulton County Sheriff's Office, to permit a search of the following:

(**Mark all that apply**)

☐     My person

☒     Real Property: _4135 Flat Shoals Rd., Union City, GA 30291_

☐     Other: _____

6

filled in the date and time.  T81-82, 92; Govt. Ex. 8.  Chaidez acknowledged to Hannan

_____

☒      The property that is listed above is owned by me, or is presently in my
        possession or under my control.

☒      I have been advised and fully understand that I have the right to refuse to give
        my consent to search.

☒      I have also been advised that I may withdraw my consent at any time.

☒      I freely and voluntarily consent to the requested search, and indicate consent by
        my below signature.

☒      I further state that no promises, threats, force, physical or mental coercion of any
        kind whatsoever have been used against me to get me to consent to the search
        described above.

 _*S/ Francisco Chaidez*_            _*[ ] 11/30/ 2012*_            _*150 AM*_
Signature                           Date                          Time

 _*Francisco Chaidez*_
Printed Name

Deputy present:  _*S/ M. Hannan*    2671_  Witness:  _*J. Farrar # 2158*_
                        Name/DID#                        Name/DID#

Govt. Ex. 8 (handwriting in italics).

[8]      Hannan testified that Chaidez checked the boxes, but he had no
independent recollection of him doing it.  T94-95, 98.  His testimony referred more to
what his general practice was, as opposed to what happened in this case.  *See* T96-98.
It makes more sense to the Court that Chaidez did not check the boxes on the
consent-to-search form and instead that Hannan checked the boxes while going over
the form with Chaidez.

that he could understand and read English somewhat.  T94.  Farrar witnessed the form being read to Chaidez in English and signed by him.  *Id.*; T61, 70-71.

After the consent-to-search form was completed, Chaidez was escorted to 4135 Flat Shoals Road.  After Chaidez and the officers entered the residence, Chaidez, his wife, their small child, and Chaidez's father were seated in the living room while the house was searched.  T62, 83.  Approximately one pound of marijuana in a gallon-size ziplock bag was located in the basement.  T63, 72-73.  Hannan also noticed that a new-looking SUV in the garage appeared to be in a state of disassembly.  He saw that there was a row of seats missing in the vehicle and recalled seeing what appeared to be that missing row of seats during the search at 4115 Flat Shoals Road.  T84.

As the search of the house was drawing to a close, Hannan asked Chaidez whether there were any other narcotics or sums of money in the house, and Chaidez stated that there was money in his bedroom under the dresser.  T85.  After the money was found under the dresser, Hannan asked him how much it was, and Chaidez told him $60,000.  T87.  Chaidez was not *Mirandized* prior to being asked any questions by Hannan or at any time during his interaction with law enforcement at 4115 and 4135 Flat Shoals Road on November 29-30, 2012.  T85.

<div align="center">8</div>

Chaidez was charged under state law and arrested for possessing the firearm with the scratched-off serial number and for trafficking in marijuana and methamphetamine. T12-13.   When these charges in Fulton County and unrelated traffic charges in Clayton County were disposed of, on March 6, 2013, Chaidez was picked up from local custody by HSI Special Agent Reagan and taken to HSI's field office, so that he could be processed for administrative immigration proceedings (since he previously had been ordered removed from the United States), as well as to be questioned about the November 2012 events.  T8, 13, 106.

Chaidez was questioned by HSI Special Agents Ledgerwood[9] and Reagan in a small processing room, which contained a table and several chairs. T8, 15, 102. Before being placed in the interview room, Chaidez initially had been placed in one of the small holding cells at the HSI office.  T15.  Chaidez was dressed in street clothes.  T15. Reagan gave Chaidez water.  During the questioning, Chaidez was not handcuffed.  T8, 15, 102-03.  Chaidez advised the agents that although he was born in Mexico, he was

---

[9]   Ledgerwood initially was present when 4115 Flat Shoals Road was searched on November 29-30, 2012.  T6.  He left the residence to transport Armenta to jail.  *Id.*  He later learned that Chaidez was arrested at that location on state charges. T7, 12-13.  He had reviewed the cell phone information obtained at the time of Chaidez's arrest, which included the cell phone contacts between Chaidez and Armenta. T20.

9

comfortable speaking to the agents in English; Ledgerwood also described Chaidez as having a level of fluency in English and stated that he was able to "communicate in English well" although he could have a problem with certain words.  T9-10, 18.

Ledgerwood orally advised Chaidez of his *Miranda* rights in English and then read Chaidez a *Miranda* waiver of rights form in Spanish, which Chaidez signed.    Govt.  Ex.  14;  T8-9,  103-04.[10]    Ledgerwood  introduced  himself

---

[10]      The rights form in Spanish was translated for the record by the official court interpreter, and provides in English as follows:

US Immigration and Customs Enforcement

Advice of Rights

Before we ask you any question, you must know your rights.
You have the right to remain silent.
Anything you say can be used against you in a court of law, or any proceeding.
You have the right to consult an attorney before you make any statement or answer any question.
You have the right to have an attorney present during the questioning.
If you cannot afford an attorney, one will be provided to you before we ask you any question, if you so desire.
If you decide to answer our questions now, you still retain the right to stop the questioning at any time, or to stop the questioning until you can consult an attorney.

AO 72A
(Rev.8/8
2)

and Reagan.  He began to ask Chaidez questions after he stated he was willing to

answer questions about his immigration status.  T17.[11]

Chaidez initially denied that he trafficked in marijuana.  T10, 19, 104.  When

confronted with the seizure of marijuana from his home, he explained that someone left

---

### WAIVER OF RIGHTS

This statement of my rights has been read and explained to me, and I fully
understand these rights.  I waive them freely and voluntarily, without
having been threatened or intimidated, and without a promise of
compensation or immunity.  I was arrested at __ (time), on __ (date) and
I have signed this document at _ (time), on __.

NAME                                     SIGNATURE

WITNESS:                              DATE:

WITNESS:                              DATE:

[Doc. 28-1].

[11]     As discussed *infra*, Chaidez challenges his March statements because
(1) they were tainted by his illegal detention in November, (2) the government failed
to prove that he understood English sufficiently to waive his *Miranda* rights, and (3) the
government violated the timely presentment requirements of the *McNabb/Mallory* Rule.
He did not contend that he only waived his *Miranda* rights as to his immigration status.
However, since the written *Miranda* form which Chaidez read and signed conveyed all
of his *Miranda* rights, a challenge to the purported limited waiver would not be
successful.  *United States v. Farley*, 607 F.3d 1294, 1326-29 (11th Cir. 2010) (holding
that no *Miranda* violation occurred where defendant was told that questioning
concerned terrorism, but he was questioned about having sex with a child, where rights
form conveyed all rights required by *Miranda*).

11

it there or gave it to him, but he denied trafficking in it.  T10.  He also was accused of

being involved with the methamphetamine found at 4115 Flat Shoals Road.  T20.

Ledgerwood told him that his statements about marijuana were not true and that they

had evidence that he was involved in large-scale ("truckloads") marijuana trafficking.

T10, 20-21, 22-23.  He told Chaidez that it was possible that his telephone calls were

intercepted (although they were not).  T23.

Chaidez ultimately stated that he had been receiving 100 to 200 pounds of

marijuana every two weeks for approximately two years and had been selling the

marijuana for profit.  T11, 104.  He identified one of his suppliers as "Primo" and stated

that Primo's brother would deliver the marijuana to Chaidez.  T112-13.  He identified

another supplier or customer by nickname and told the agents how that person was

listed in his cell-phone contact list.  T125.  He denied his involvement in the

methamphetamine operation at 4115 Flat Shoals Road.  T105, 111.  He stated the

firearm located when he was arrested was given to him by a friend.  T110-11.

Chaidez stated that 4115 Flat Shoals Road was rented by his brother in his

sister's name and that his brother had been deported back to Mexico.  T25.  He

explained that Armenta had been renting the house for $1100 per month, which

Chaidez remitted to the landlord (for whom he acted as caretaker), and further

12

explained that Armenta had been there for one month when he was arrested. T25, 33-34.

The HSI agents' questioning lasted thirty to forty-five minutes.  T18.  At the conclusion of the questioning, Chaidez was placed in immigration custody for removal, which removal has been delayed due to the pending charges.  T26.

### Contentions of the Parties

The government first argues that Chaidez was properly detained in the backyard of 4115 Flat Shoals Road, because Chaidez appeared at the location where the officers were executing a search warrant for drugs late at night/early in the morning.  [Doc. 28 at 6-8.  The government further argues that as part of that lawful detention, Chaidez was properly handcuffed.  [*Id.* at 8-9.  It also argues that the firearm with the obliterated serial number was properly observed and seized either because it was on the ground or pursuant to a lawful *Terry* pat-down.  [*Id.* at 9 & n.5].  It additionally contends that as part of the lawful detention, the officers were entitled to ask him why he was hiding in the backyard of a house found to contain thirty pounds of methamphetamine.  [*Id.* at 8].

The government next argues that the officers were not required to read Chaidez his *Miranda* rights during this detention because he was not taken into custody at that

AO 72A
(Rev.8/8
2)

time. [*Id.* at 9-12]. It contends that neither handcuffing Chaidez nor the limited questioning about his presence converted his lawful detention into a formal arrest requiring *Miranda* warnings. [*Id.* at 12 (citations omitted)]. Alternatively, the government argues that if Chaidez was deemed to be in custody at this point, the questioning was proper under *Miranda*'s book-in exception. [Doc. 28 at 13 n.6]. The government concedes, however, that once Chaidez was taken inside 4115 Flat Shoals Road, he was in custody for *Miranda* purposes. [*Id.* at 13 n.7].

The government next contends that Chaidez's cell phone was properly searched without a warrant as incident to his lawful arrest, relying in support upon decisions from this Court and other circuits. [*Id.* at 14-17]. Alternatively, the government argues that the search was lawful under the inevitable discovery rule because once Chaidez was arrested for narcotics trafficking following the search of his home, his cell phone would have been searched. [*Id.* at 17 n.10].

Next, the government contends that Chaidez voluntarily consented to the search of his home, [*id.* at 18-19], and that the failure to give him *Miranda* warnings did not vitiate his consent. [*Id.* at 20]. It also argues that the $60,000 seized from his house should not be suppressed because, although Chaidez was not *Mirandized* before being asked about it, his statements were nonetheless voluntary, and voluntary but

14

non-*Mirandized* statements do not bar the introduction of physical evidence seized as a result of the statements. [*Id.* at 20-21].

The government also argues that Chaidez's fingerprints were lawfully obtained because his Fulton County arrest for possession of the firearm and trafficking in marijuana and methamphetamine were supported by probable cause. [*Id.* at 21-22]. It alternatively argues that even if his arrest was without probable cause, he would not be entitled to have his fingerprints suppressed as a result of the Eleventh Circuit's decision in *United States v. Farias-Gonzalez*, 556 F.3d 1181 (11th Cir. 2009). [Doc. 28 at 23].

Finally, the government argues that Chaidez's March 6 statements were in compliance with *Miranda* and were voluntarily obtained. [*Id.* at 23-25].

In response, Chaidez first argues that the seizures of personal property (cell phone, keys, etc.) from him, when, according to the government, he was merely detained, violated his rights under the Fourth Amendment because they were seized without probable cause and because the seizure of those items had nothing to do with officer safety in the course of an investigative detention. Thus, he argues, the officers improperly tested his keys on the locks at 4115 Flat Shoals Drive. [Doc. 32 at 10-11].

15

As for the search of the cell phone once he was brought into the house, Chaidez argues that such a search was inconsistent with a limited *Terry* detention. [*Id.* at 12-13]. He also argues that the cell phone was not lawfully searched incident to his arrest because the Supreme Court has limited such searches to any evidence of the offense of arrest, citing *Arizona v. Gant*, 556 U.S. 332, 339 (2009), and *Chimel v. California*, 395 U.S. 752, 769 (1969). [Doc. 32 at 13-14]. In this case, at the time of his arrest, the only offense for which probable cause existed was the firearms charge, and the searching officers had no reason to believe that evidence related to that offense would be on the cell phone. [*Id.* at 16]. He also argues that at least one court of appeals has concluded that cell phones are not properly searched incident to arrest under any circumstances. [*Id.* at 14-15 (citing *United States v. Wurie*, 728 F.3d 1 (1st Cir. 2013)]. Moreover, he disputes the government's argument that either the inevitable discovery doctrine or his "consent" to search the cell phone during the March 6, 2013, questioning saved the search conducted at the time of his arrest. [*Id.* at 16 nn.4 & 5].

Chaidez next argues that his consent to search his home was not voluntary. First, he argues that the government did not prove that he completed the consent-to-search form, or that he even understood the form or the English language. Moreover, it was

16

unclear who checked the boxes on the consent-to-search form, and thus the government did not establish the proper scope of the consent. [*Id.* at 17]. He also argues that the consent was tainted by his illegal detention and the seizure of his cell phone and keys, adding that as a result of these seizures, he needed to convince the officers that he lived elsewhere. [*Id.* at 17-18].

Chaidez then contends that his statements on March 6, 2013, were unlawfully obtained. He first claims that they were the direct fruit of his illegal detention and the search of his cell phone and use of his keys in November 2012. [*Id.* at 19]. He further argues that even if his initial detention was lawful, the unlawful search of his cell phone, un-*Mirandized* statements, and involuntary consent to search his home resulted in investigative leads that resulted in law enforcement's desire to question him on March 6, and thus, the questioning was the direct fruit of the prior illegalities. [*Id.* at 19-20]. Thus, Ledgerwood had all of this ill-gotten information when he interrogated Chaidez in March 2013, and when Chaidez initially denied trafficking in marijuana, Ledgerwood confronted him with his telephone calls with Armenta in an attempt to tie him to trafficking methamphetamine, which caused him to confess to marijuana trafficking instead. [*Id.* at 20-21]. He contends therefore that his confession must be suppressed because the questioning was tainted by the prior

17

illegal seizures.  [Doc. 32 at 25].  He also alleges that his statements were tainted by the failure to advise him of *Miranda* rights when he was questioned in November.  [*Id.* at 25 n.8].

Finally, Chaidez argues that his March 2013 statements were unlawfully obtained in violation Federal Rule of Criminal Procedure 5 and 18 U.S.C. § 3501's presentment requirement.  He alleges that HSI "had" Fulton County arrest him in November 2012, but placed an immigration hold on him.  He claims he was transferred to Clayton County when the Fulton County charges were dismissed but was not released from Clayton County when it dismissed its charges because of the HSI hold.  Chaidez argues that the so-called *McNabb-Mallory* Rule, derived from Rule 5 and § 3501, applies to immigration holds, and he alleges that he was detained "for days if not weeks" and was not timely brought before a federal magistrate judge.  Thus, he contends his statements must be suppressed.  [Doc. 32 at 27-28].

In reply, the government reiterates that Chaidez was not arrested until he was moved from the backyard into 4115 Flat Shoals Road.  [Doc. 35 at 2-3].  It also argues that even if the actual arrest occurred later, the searches still were valid as incident to arrest even if they temporally preceded the actual arrest.  [*Id.* at 3 n.1 (citing *United States v. Thompson*, 244 Fed. Appx. 926, 926 (11th Cir. June 15, 2007))].

18

The government further contends that seizing Chaidez's keys was proper incident to his arrest. [Doc. 35 at 3-4 (citing *United States v. Herrara-Contreras*, 269 Fed. Appx. 876-77 (11th Cir. Mar. 12, 2008) (affirming 1:06-cr-00269-CAP/AJB, ECF No. 87)].

Next, with regard to the search of the cell phone, the government contends that *Wurie*'s bright-line rule is inconsistent with the bright-line rule established in *United States v. Robinson*, 414 U.S. 218, 235 (1973), which allows the search of any item found on the person of an arrestee. [Doc. 35 at 5]. It also argues that Chaidez has not explained why the Court should follow *Wurie* as opposed to other cases which have allowed the search of cell phones incident to arrest. [*Id.*].

The government further argues that Chaidez's consent to search was voluntary because the evidence is unrebutted that Chaidez's English was good, that he had a level of fluency, and that he admitted he could understand and read English. [*Id.* at 5-6]. Next, it argues that his consent was not tainted by an illegal detention because he was lawfully arrested. Moreover, even if his keys and cell phone were illegally seized and searched, any taint from those actions was dissipated by the twenty-minute delay in asking Chaidez to consent, he was afforded and signed the consent-to-search form, and the search of his person and his detention were legal. [*Id.* at 6-7].

19

Finally, the government contends the Chaidez's March 2013 statements were lawfully obtained.  First, it alleges that the taint of any unlawful searches in November were dissipated by the time he was interviewed at the HSI field office.   [*Id.* at 8]. Second, it argues that any unlawful searches concerned Chaidez's relationship with the methamphetamine and 4115 Flat Shoals Road, but his March 2013 statements concerned marijuana and were unrelated either to the search of the cell phone or the use of the keys.  [*Id.* at 9].  Third, it argues that the *McNabb/Mallory* Rule was not implicated in this case because the questioning occurred as soon as he was in federal custody and before he was held in immigration custody.  [*Id.* at 10].

### *Discussion*

### A.    Chaidez was arrested in the backyard of 4115 Flat Shoals Road

The government contends that Chaidez was not arrested, but merely detained, until he was brought into 4115 Flat Shoals Road.  Chaidez contends his seizure was altogether unlawful.

The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual, and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and

AO 72A
(Rev.8/8
2)

restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown searches, or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975). *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989) (recognizing that Fourth Amendment is implicated in the second tier where a police officer briefly detains a citizen for investigatory purposes, or in the third tier where a police officer holds a citizen pursuant to an arrest). To justify a detention and seizure under the Fourth Amendment in the investigatory context, the police officer must show "a reasonable and articulable suspicion that the person has committed or is about to commit a crime." *Id.*; *see also Terry*, *id.* If the "totality of the circumstances" demonstrates that the detention is too intrusive to be for merely investigatory purposes, the encounter is considered an arrest, which must be supported by probable cause. *Hastamorir*, 881 F.2d at 1556.

Whether an arrest has occurred depends upon the nature and degree of the intrusion under all the facts of the particular encounter. *United States  v. Vargas*, 643 F.2d 296, 298 (11th Cir. 1981). No formal words of arrest are required, and it is not necessary that a formal arrest be made. *Id.* (citing *Dunaway v. New York*,

21

442 U.S. 200 (1979)).  The Eleventh Circuit has recognized a non-exclusive list of factors that may indicate an arrest: "the blocking of an individual's path or the impeding of his progress; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual." *Hastamorir*, 881 F.2d at 1556.  The subjective belief of an officer that an individual was not arrested is irrelevant, particularly where that belief is not communicated to the suspect.  *United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980) (opinion of Stewart, J.); *see also Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (recognizing that "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis"); *Craig v. Singletary*, 127 F.3d 1030, 1041 (11th Cir. 1997) (same).

The Court disagrees with the government's claim that Chaidez was merely detained[12] until he was moved into 4115 Flat Shoals Road and concludes that Chaidez

---

[12]     The Court agrees with the government that the search warrant for the premises and curtilage of 4115 Flat Shoals Road authorized Chaidez's detention.  *See Michigan v. Summers*, 452 U.S. 692 (1981), and *Muehler v. Mena*, 544 U.S. 93 (2005) (holding that police executing a search warrant may detain occupants of the premises and those immediately outside while the search is conducted even in the absence of a particular suspicion that any individual located is involved in criminal conduct or poses a specific danger to the officers); *see also Bailey v. United States*, 133 S. Ct. 1031, 1038-39 (2013) (holding that *Mena* and *Summers* did not authorize bringing a suspect who had left the residence and was a mile away from it back to the residence).  In this

was arrested when he was first encountered, forced to lay prone on the ground, handcuffed, and searched while under the tree in the backyard of 4115 Flat Shoals Road. The test for whether an arrest occurred is whether the suspect is " 'subjected to restraints comparable to those associated with a formal arrest.' " *United States v. Acosta*, 363 F.3d 1141, 1149 (11th Cir. 2004) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). The Court recognizes that officers can draw their weapons and handcuff a suspect without necessarily transforming an investigatory detention into an arrest. *Acosta*, 363 F.3d at 1147; *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995); *Hastamorir*, 881 F.2d at 1557 (holding that officer drawing his gun and handcuffing the suspect was reasonable and did not convert investigatory detention into arrest) (citing *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985), and *United States v. Roper*, 702 F.2d 984, 988 (11th Cir. 1983)). *But see United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (quoting *Dunaway*, 442 U.S. at 215 & n.17, for "listing

--------

case, the officers were searching the residence late at night for large quantities of methamphetamine. They had located the contraband as well as a firearm. Chaidez was observed in the backyard under a tree in the dark using a flashlight towards the searched residence. Under these circumstances, the officers were authorized to order him to lay prone on the ground, handcuff him, and pick him up in preparation for moving him to the house. *See Mena*, 544 U.S. at 99-101; *Croom v. Balkwill*, 645 F.3d 1240, 1247 (11th Cir. 2011).

23

handcuffs as a 'trapping[ ] of a technical formal arrest' "). Nor does being forced to lay on the ground necessarily convert a detention into an arrest. *Courson v. McMillian*, 939 F.2d 1479, 1492-93 (11th Cir. 1991) (ordering suspect to lie face down does not convert detention into arrest); *Jackson v. Sauls*, 206 F.3d 1156, 1166 n.13 (11th Cir. 2000) (same, citing *Courson*); *see also United States v. Campbell*, 436 Fed. Appx. 518, 524 (6th Cir. Aug. 26, 2011) ("As a preliminary matter, we conclude that Officer Claiborne's initial stop of Campbell and his request that Campbell get on the ground was not an arrest.").

However, the Court concludes that Chaidez was arrested because the officers exceeded the scope of a permissible *Terry* stop. Under *Terry*, 392 U.S. at 30, a police officer who has lawfully stopped an individual may "conduct a carefully limited search of the outer clothing of such person[] in an attempt to discover weapons which might be used to assault him." *See also United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002) (quoting *Terry*, 392 U.S. at 27). The search may continue when an officer feels a concealed object that he reasonably believes may be a weapon. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). However, the search of Chaidez in the backyard exceeded that allowed by a *Terry* frisk. The evidence does not show that Chaidez was frisked or patted down at all, but rather, he was subjected to a

24

full-blown search, and his cell phone, keys and currency were removed from him. Even if he initially was frisked, the record is completely devoid of testimony that the frisking officer concluded that something he felt on Chaidez's person was a weapon or otherwise was properly seized under the "plain feel" doctrine recognized in *Minnesota v. Dickerson*, 508 U.S. 366 (1993).

" '[O]nce a *Terry* stop exceeds its carefully circumscribed limits, the police must observe the probable cause requirement.' "   *United States v. Vasquez-Ortiz*, 344 Fed. Appx. 551, 553-54 (11th Cir. Sept. 16, 2009) (quoting *United States v. Mosquera-Ramirez*, 729 F.2d 1352, 1356 (11th Cir. 1984) (citation omitted)); *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir. 1985) (holding that "when the police told [the defendant] to empty the contents of his pockets on the motel counter, they so intruded on him as to effect an arrest requiring probable cause"); *United States v. Tookes*, 633 F.2d 712, 715 (5th Cir. Unit B 1980)[13] (arrest occurred where individual apprehended by detaining him on ground, searched to the point of removing his socks and shoes, placed in police car, and driven five minutes to different location); *see also Florida v. Royer*, 460 U.S. 491, 499 (1983) (*Terry* investigative

---

[13]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

detention does not authorize a "full search of the person"); *United States v. Haywood*, 506 Fed. Appx. 424, 427 (6ᵗʰ Cir. Nov. 26, 2012) ("A *Terry* stop allows officers only to frisk a person for the safety and protection of officers; it does not permit a full search for evidence of criminal activity.") (citing *Dickerson*, 508 U.S. at 378).

Thus, Chaidez was arrested for purposes of the Fourth Amendment immediately after he was encountered in the backyard.

### B.    Chaidez's arrest was supported by probable cause

As previously noted, the officers were authorized to detain Chaidez upon finding him in the backyard.  Upon standing him up and seeing the firearm with its serial number scratched off, probable cause existed to effect an custodial arrest.  Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense."   *United States v. Floyd*, 281 F.3d 1346, 1348 (11ᵗʰ Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11ᵗʰ Cir. 1992).  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."   *Adams v. Williams*, 407 U.S. 143, 149 (1972).  In determining whether probable cause exists, the Court

26

" 'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 229-31 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized."   *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted).

Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States*, 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California*, 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the

27

AO 72A
(Rev.8/8
2)

application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

Applying these standards to this case, there was probable cause to arrest Chaidez for possessing the firearm with the scratched-off serial number.[14]   As a result, the undersigned **RECOMMENDS** that Chaidez's motion to suppress that relates to his fingerprints being unlawfully taken be **DENIED**.

### C.    Chaidez was lawfully searched following his arrest

Chaidez claims he was unlawfully searched because he was merely detained when he was searched.  Having found that Chaidez was lawfully arrested, the Court concludes he was properly searched, and the cell phone, currency, and keys were properly seized and searched.

### 1.    *Chaidez was properly searched incident to lawful arrest*

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.

---

[14]     Section 16-9-70 of the Official Code of Georgia makes it a crime, *inter alia*, for a

person . . .  [to have] in his or her possession a . . . firearm[] . . . from which he or she knows the manufacturer's name plate, serial number, or any other distinguishing number or identification mark has been removed for the purpose of concealing or destroying the identity of such article.

28

Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the government must prove that the search was reasonable based upon a recognized exception to the warrant requirement. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Bachner*, 706 F.2d 1121, 1125-26 (11th Cir. 1983)); *see also Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

A search incident to a lawful arrest is one of those recognized exceptions. *United States v. Robinson*, 414 U.S. 218, 224 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 471 (1971) (opinion of Stewart, J.); *Chimel v. California*, 395 U.S. 752, 762-763 (1969). In *Robinson*, after discussing the historical bases for a search following an arrest, the Court held:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each

AO 72A
(Rev.8/8
2)

instance into an analysis of each step in the search.  The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.  A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

*Robinson*, 414 U.S. at 235.

Thus, the police properly removed the currency, wallet, keys, and cell phone from Chaidez's person.  The keys could be tested to see if they fit the doors at 4115 Flat Shoals Road.  *United States v. Edwards*, 415 U.S. 800, 807-08 (1974); *United States v. Herrara-Contreras*, 269 Fed. Appx. 875, 876-77 (11th Cir. 2008).[15]

### 2.   *Chaidez's cell phone was properly searched*

Beyond the argument that he was searched when he was merely detained, Chaidez challenges the search of his cell phone on two additional grounds: first, that *Gant* does not authorize a search of a cell phone incident to an arrest for a crime

---

[15]   The Eleventh Circuit in *Herrera-Contreras* affirmed Judge Pannell's adoption of the undersigned's R&R in that case.  *See* Crim. Action No. 1:06-cr-269-CAP-AJB, ECF No. 87.

unrelated to the offense of arrest; and second, that the warrantless search of a cell phone is *per se* unlawful, as was held by the First Circuit in *Wurie*. The Court first discusses the implication of the *Gant* decision on searches incident to a lawful arrest.

The question necessarily arises whether, during the course of a search incident to a lawful arrest, the police are entitled to search for and seize evidence beyond that related to the offense of arrest.[16] Chaidez argues that even if a cell phone could be searched incident to arrest generally, his cell phone was not properly searched in this case because at the time of the cell phone search, there was only probable cause supporting an arrest on the firearms charge, evidence of which would not likely be located on the cell phone.[17] The Eleventh Circuit to date still has not decided whether

---

[16]    The government argues that even if the cell phone was searched prior to Chaidez's arrest for drug trafficking, it was close enough in time to be considered a search incident to his arrest. *Thompson*, 244 Fed. Appx. at 926. However, the government never actually established exactly when the cell phone was searched, other than claiming that it was searched sometime after it was seized and before it was turned over to the evidence custodian. However, that period spanned a number of hours. *Thompson*, and the Supreme Court case upon which it relied, *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980), characterized the time span between the pre-arrest search and formal arrest as "quick." Thus, *Thompson* and *Rawlings* are inapposite to the present case.

[17]    That is not necessarily true in all instances, because the extensive use of cell phones to take photographs (including of oneself ("selfies")), receive and send emails and texts, and visit social media websites renders them an almost limitless repository of personal information. Because the government did not establish the

31

police may search an arrestee's cell phone incident to a lawful arrest and without a search warrant, *see United States v. Allen*, 416 Fed. Appx. 21, 27 (11th Cir. Jan. 31, 2011) ("It is a fairly difficult question, however, it is also a question that we need not answer today."); nor has it discussed the scope of a warrantless search of a cell phone in general.

There is language in *Robinson* that could be read to limit a post-arrest search for evidence to evidence related to the offense of arrest. *See Robinson*, 414 U.S. at 234 ("The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial.") (citations omitted). However, it is significant that the defendant in *Robinson* was arrested for driving on a revoked driving permit, and in searching the defendant's person, a crumpled-up cigarette package containing heroin was discovered. *Id.* at 221-23; *id.* at 236-37 (upholding search incident to lawful arrest even though search would have produced no further evidence of driving with revoked permit). As a result,

---

capabilities of Chaidez's cell phone or argue that the firearm offense for which he was initially arrested provided grounds to search his cell phone, the Court does not rely upon this potential reason for upholding the search.



AO 72A (Rev.8/82)

*Robinson* does not support a limitation on the scope of the search of a defendant's person incident to arrest.[18]

Nor does the Supreme Court's more recent pronouncement on the scope of searches incident to lawful arrest create such a limitation. *See Arizona v. Gant*, 556 U.S. 332 (2009). In *Gant*, the Court held that under the search-incident-to-arrest exception, the "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351. Significantly, the *Gant* Court observed that its decision was based on "circumstances unique to the vehicle context [that] justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (internal quotation and citation omitted); *see also id.* at 345 ("A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no

---

[18]    *Knowles v. Iowa*, 525 U.S. 113 (1998), which prohibited the search of a vehicle after the officer issued a traffic citation but did not arrest the driver, does not compel a different result.  The result in that case was not based on the fact that the vehicle was unlikely to contain additional evidence of the cited offense but rather upon the ground that the defendant was not arrested and thus the officer did not have the same search authority as in *Robinson*.  *See Virginia v. Moore*, 553 U.S. 164, 177 (2008) (discussing reasoning underlying *Knowles* decision).

33

basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals.").  Thus, any limitation on a search incident to lawful arrest imposed by *Gant* appears to be related to searches of vehicles in which arrestees recently were located.

The undersigned has not found any case in which *Gant* has been held to limit the search of an arrestee's *person* to only evidence of the offense of arrest.  Instead, the majority of other federal courts that have considered the issue have not applied *Gant*'s limitations to non-vehicular searches.  *See United States v. Rodriguez*, 702 F.3d 206, 209-10 (5th Cir. 2012) (not deciding whether *Gant* applies beyond the vehicular context but applying precedent allowing search of cell phone incident to arrest); *Haywood*, 506 Fed. Appx. at 428 (holding search of defendant's pants proper following arrest for resisting arrest by stating, "It matters not that the search would not have provided further evidence of Haywood's crime—resisting officers," and citing *Robinson*, 414 U.S. at 236-37); *United States v. Brewer*, 624 F.3d 900, 906 (8th Cir. 2010) (declining to apply *Gant* to search of arrestee's person); *United States v. Perdoma*, 621 F.3d 745, 751-52 (8th Cir. 2010) (declining to apply *Gant* to a search of bag recovered from area within arrestee's immediate control); *United States v. Gomez*, 807 F. Supp. 2d 1134, 1143 (S.D. Fla. 2011) (denying motion

34

to suppress search of cell phone and holding that "[w]hile *Gant* signaled a retraction from the ever-expanding line of *Belton*[19] cases in the vehicle context, it is still well established that any objects found on an arrestee's person, on his clothing, on any area within his immediate control, may be searched by law enforcement, *with or without* any reason to suspect that the person is armed or carrying contraband.") (emphasis in original) (citation omitted).  *But see United States v. Shakir*, 616 F.3d 315, 318 (3d Cir. 2010) (upholding search of bag, but noting, "[b]ecause *Gant* involved an automobile search, and because it interpreted *Belton*, another automobile case, the Government contends that the rule of *Gant* applies only to vehicle searches.  We do not read *Gant* so narrowly.  The *Gant* Court itself expressly stated its desire to keep the rule of *Belton* tethered to the justifications underlying the *Chimel* exception, and *Chimel* did not involve a car search."  (internal citation and quotation marks omitted)).  Moreover, the District Judge assigned to the present case has held that warrantless searches of cell phones incident to the lawful arrest of a defendant are constitutional even after *Gant*.  *United States v. Dixon*, --- F. Supp. 2d ----, ----, 2013 WL 6055396, at *4-6 (N.D. Ga. Nov. 15, 2013) (Evans, J.) (citing cases in support, but holding that cell-phone search in that case was not lawful where arresting agent searched cell phone

---

[19]     *New York v. Belton*, 453 U.S. 454 (1981).

35

with data-extraction device once agent returned to his office and well after defendant's arrest).

In addition, Chaidez's arguments about the search of the cell phone generally are rejected.  First, the Court concludes that *Wurie*'s categorical rejection of the searches of cell phones incident to lawful arrest is not supported by Supreme Court precedent or the overwhelming majority of other federal courts that have considered the issue. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context.").

Second, the undersigned agrees with the Eleventh Circuit that this is a difficult question and to prophesize how the Supreme Court or the Eleventh Circuit will rule on this issue is fraught with uncertainty.  The Court recognizes that cell phones today are repositories of far greater information than cell phones[20] of even a few years vintage,

---

[20]     The record is silent as to the type of cell phone taken from Chaidez.  Three cell phones were seized during the investigation on November 29-30, including a Samsung SPH M270, an Apple iPhone, and a Motorola cell phone.  [Govt. Ex. 3].  The Court assumes that the Motorola cell phone was seized from Armenta during the traffic stop, since it was turned into the evidence custodian by a Georgia State Trooper.  *Id.* at 2.  The Samsung phone was seized with other accessories, which leads the Court to assume it was seized from 4115 Flat Shoals Road, and thus the cell phone seized from Chaidez probably was the iPhone.  The government is reminded that it bears the burden of proof on the propriety of warrantless searches, and it should not cavalierly leave gaps in the evidentiary record.

AO 72A
(Rev.8/8
2)

and that the purposes and uses of these devices are far greater than items which might traditionally have been the subject of incident-to-arrest searches, such as wallets or purses.

Nonetheless, the Court agrees with those courts that have concluded that an arrestee's cell phone properly may be searched without a warrant as incident to his lawful arrest. *United States v. Rodriguez*, 702 F.3d 206, 209-10 (5th Cir. 2012) (relying on *United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (cell phone properly searched without a warrant pursuant to defendant's arrest for drug trafficking)); *United States v. Flores-Lopez*, 670 F.3d 803, 810 (7th Cir. 2012) (upholding search incident to arrest of cell phone for its phone number but questioning whether more invasive search would be permissible); *Silvan W. v. Briggs*, 309 Fed. Appx. 216, 225 (10th Cir. Jan. 23, 2009) (holding that "the permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person") (citing *Finley*, 477 F.3d at 260); *United States v. Mendoza*, 421 F.3d 663, 668 (8th Cir. 2005); *United States v. Murphy*, 552 F.3d 405, 410-12 (4th Cir. 2009) (upholding search of cell phone as incident to arrest); *United States v. Ortiz*, 84 F.3d 977, 982-84 (7th Cir. 1996) (officers were authorized to seize pursuant to arrest a suspected heroin supplier's pager and wristwatch containing an electronic telephone directory in order to preserve

37

evidence, since the pager's electronic memory was finite or could easily be destroyed or lost); *United States v. Gomez*, 807 F. Supp. 2d 1134, 1149 (S.D. Fla. 2011) (holding that "the immediate search at the scene of the cell phone's call log history, limited to phone calls from the preceding 24-48 hours, in our view, was reasonable and appropriate under Supreme Court and Eleventh Circuit precedent"); *see also United States v. Henry*, 936 F. Supp. 2d 1279, 1284 (N.D. Ga. 2013) (Batten, J., *adopting* Baverman, M.J.) (citing cases); *United States v. McCray*, No. CR408-231, 2009 WL 29607, at * 3 (S.D. Ga. Jan. 3, 2009) (collecting cases). *Cf. United States v. Quintana*, 594 F. Supp. 2d 1291, 1299-1300 (M.D. Fla. 2009) (suppressing search of cell phone's digital photo album incident to arrest for driving while license suspended)

The Court recognizes that most of these cases allowing cell phone searches as incident to a lawful arrest are drug cases, and thus if *Gant* means that a search incident to arrest is limited to the arrest of offense, some additional justification to search a cell phone was present in those other cases as a result of the almost universal use of cell phones in the drug trade. Still, the undersigned concludes that, as *Robinson* recognized over forty years ago, a valid search incident to arrest needs no additional justification, and concludes, particularly in light of the serious firearm charge for which Chaidez was initially arrested, the limited search of the cell phone was reasonable under the Fourth

38

Amendment.  *See Gomez*,  807 F. Supp. 2d at 1145 (noting that search incident to arrest

may also be limited by the reasonableness component of the Fourth Amendment)

(citations omitted).  The cell phone search in this case was extremely limited, with the

officers viewing at most the call log and the contact list (which the government is not

seeking to use at trial).[21]

---

[21]     The Court rejects the government's alternative argument that search of the cell phone was justified under the inevitable discovery doctrine, because at the end of the search of the residences, Chaidez was arrested for drug trafficking, which would have authorized the search of his cell phone even if *Gant* limited the scope of a search incident to lawful arrest to the offense of arrest.

In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court recognized that evidence obtained by unconstitutional means should not be suppressed "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police. . . ." *Nix*, 467 U.S. at 447; *United States v. Khoury*, 901 F.2d 948, 959-60 (11th Cir. 1990); *see also United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (stating that government's burden was to establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means) (citing *Nix*, 467 U.S. at 434).  The mere assertion by law enforcement that the information would have been inevitably discovered is not enough. *Virden*, 488 F.3d at 1322 (citing *United States v. Brookins*, 614 F.2d 1037, 1048 (5th Cir. 1980)).  Instead, the Eleventh Circuit's rule is that in order to establish inevitable discovery the prosecution must show that " 'the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct.' " *Id.* (quoting *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004)) (emphasis in original); *see also Khoury*, 901 F.2d at 960; *United States v. Drosten,* 819 F.2d 1067, 1070 (11th Cir. 1987); *United States v. Satterfield,* 743 F.2d 827, 847 (11th Cir. 1984).  "This second requirement is especially important.  Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have

39

Therefore, the undersigned **RECOMMENDS** that Chaidez's motion to suppress as it relates to the search for and seizure of his cell phone, currency, wallet, and keys, and the subsequent use of the keys and search of the cell phone, be **DENIED**.

### D.    Chaidez voluntarily consented to the search of his home

Chaidez contends that his consent to search 4135 Flat Shoals Road was involuntary because it was tainted by his illegal detention and searches.  However, as just discussed, Chaidez was lawfully arrested and searched; thus, there is no illegal taint.[22]

Moreover, his consent was otherwise voluntary.   A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant.   *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)).  "In order for consent to

---

obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." *Virden*, 488 F.3d at 1322-23 (citing *United States v. Hernandez-Cano*, 808 F.2d 779, 784 (11th Cir. 1987)).

At the time the cell phone was searched, the officers were not actively pursuing the lawful means which would have justified the search.

[22]    Moreover, even if Chaidez's cell phone was illegally searched, there is no evidence that such search occurred in his presence such that it would have coerced him to consent to a search of his residence.

40

a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality-of-circumstances inquiry). Further, " '[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 550 (1968)); *see also Bostick*, 501 U.S. at 438 (" 'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the

presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798-99. However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

The totality of the circumstances points to a finding of voluntary consent. First, although Chaidez was in custody, the fact of custody alone does not vitiate voluntary consent. *United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (citing *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)). In any arrest there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent. *Jones, id.* In this case, both questions are answered in the negative. The record is bereft of evidence that any coercion greater than minimally necessary to effectuate the arrest was used against Chaidez. To the extent Chaidez felt a need to separate himself from

42

4115 Flat Shoals Road and demonstrate that he resided at 4135 Flat Shoals Road, that desire was solely self-initiated and not compelled by any actions or words of the police.

Third, the record shows that prior to consenting to the search, Chaidez was cooperative with the officers.  Hannan overheard him speaking with other officers before he approached him and asked him for consent.

Fourth, the written consent form advised Chaidez of his right to refuse to consent to the search.  Fifth, as to Chaidez's education and intelligence, the Court rejects Chaidez's argument that the record does not show that he had sufficient comprehension in English to understand what Hannan was explaining to him.  The evidence is undisputed that Chaidez stated he spoke English, had a level of fluency in it although he had difficulty with some words, and stated that he could understand and communicate in English.  In addition, although the record does not contain information as to Chaidez's educational level, he was the caretaker for the rental property and collected the rent for the landlord, indicating an appropriate level of competence, intelligence, and responsibility.

Sixth, Chaidez had to suspect that the search of his residence would uncover the marijuana and currency.  However, courts have held that this factor alone is not sufficient to support a finding that the consent was involuntary.  *United States v.*

*Flowers*, 424 Fed. Appx. 302, 303-04 (11th Cir. May 2, 2011) (although defendant likely knew contraband would be found, consent still valid); *United States v. Henry*, Crim. Action File No. 1:10-cr-521-2-TCB, 2013 WL 3475185, at *2 (N.D. Ga. July 10, 2013). In any event, to the extent that Chaidez consented to a search of his house in order to prove to the officers that he did not live at 4115 Flat Shoals Road, then he necessarily believed that no incriminating evidence would be found at his residence. Thus, all of these factors point towards a finding that Chaidez's conset was voluntary.

In addition, Chaidez's consent was not rendered involuntary either because he was not *Mirandized* before he was asked for consent or, as discussed below, certain of his statements on November 29-30 were obtained in violation of *Miranda*. First, a consent to search is not a self-incriminating statement and, thus, the failure to give a defendant a *Miranda* warning does not render the defendant's consent to search invalid. *United States v. Brown*, 223 Fed. Appx. 875, 880 (11th Cir. Mar. 29, 2007) (citing *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993)). Second, *Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement. *United States v. Patane*, 542 U.S. 630, 645 (2004) (Kennedy, J., concurring in the judgment); *United States v. Jackson*,

44

506 F.3d 1358, 1361 (11th Cir. 2007).  As will be demonstrated *infra*, although Chaidez's statements at 4115 Flat Shoals Road were not *Mirandized*, they were nonetheless voluntary.  Thus, those statements did not taint his consent to search or require the suppression of the physical evidence seized as a result of his consent and un-*Mirandized* statement.

Accordingly, the undersigned **RECOMMENDS** that Chaidez's motion to suppress on the grounds that his consent to search was involuntary be **DENIED**.

### E. Two of Chaidez's November statements were obtained in violation of *Miranda*, but his March statements were in compliance with *Miranda* and voluntary

#### 1. November 2012 statements

As discussed, upon being searched in the backyard of 4115 Flat Shoals Road, Chaidez was under arrest.  The procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436 (1966), are required in instances of custodial interrogation.  *United States v. Moody*, 977 F.2d 1425, 1434 (11th Cir. 1992); *see also  Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir. 1989) (*Miranda* warnings are required only in the situation of a custodial interrogation).  The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, *Missouri v. Seibert*,

542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475,[23] or whether some exception to the *Miranda* rule applies, *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991)); *United States v. DeSumma*, 44 F. Supp. 2d 700, 703 (1999) (citing *Connelly*, 479 U.S. at 168).

a.      **Chaidez's statement about his presence in the backyard**

The government argues that Farrar's questioning of Chaidez about what he was doing in the backyard did not require *Miranda* warnings but rather is subject to *Miranda*'s book-in exception. That exception provides that an answer to a question about a person's identity, even though the person is in custody, is "nonetheless admissible because the question[ ] fall[s] within a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data

---

[23]      On the other hand, the defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).

46

necessary to complete booking or pretrial services.' " *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation omitted); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (holding that an officer's request for " 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating") (quoting *United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983) (per curiam)); *see also Harryman v. Estelle*, 597 F.2d 927, 930-31 (5th Cir. 1979) (non-investigative questioning of detainees, such as biographical inquiries, not to be subject to *Miranda* rule); *United States v. Jones*, 457 F.2d 697, 699 (5th Cir. 1972) (holding it not necessary to give defendant *Miranda* warnings before asking him his name). However, without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Muniz*, 496 U.S. at 602 n.14 (citation and quotation marks omitted).

Farrar's question about Chaidez's purpose in the backyard does not fall under the book-in exception. It was not designed to determine his identity or biography, but rather to determine why he was in the backyard of a residence being searched for a large quantity of methamphetamine. *See United States v. Guess*, 756 F. Supp. 2d 730, 741-42 (E.D. Va. 2010) (suppressing question about ownership

47

of truck defendant drove to methamphetamine deal, holding that "[w]hile knowing whether the Defendant owned the truck may be relevant to booking him, . . . the primary purpose of the question was to have the Defendant connect himself to the truck in his own words, and ultimately to any evidence the police hoped to obtain during a search of the vehicle." (footnote omitted)).

As a result, the undersigned **RECOMMENDS** that Chaidez's explanation for being in the backyard of 4115 Flat Shoals Road be suppressed from the government's case-in-chief.

### b. Hannan's other questioning of Chaidez while in 4115 Flat Shoals Road

On the other hand, Hannan's questions about where Chaidez lived and with whom satisfy the book-in exception. As a result, the undersigned **RECOMMENDS** that the motion to suppress be **DENIED** as to these statements.

### c. Hannan's questioning about any more money or drugs at 4135 Flat Shoals Road

As the government concedes, Hannan's questioning of Chaidez near the end of the search of 4135 Flat Shoals Road about the presence of any other quantities of contraband or currency and then, after the currency was located, asking how much money it was, was conducted while Chaidez was in custody, without the benefit of

48

*Miranda* warnings, and no exception to *Miranda* applies. [Doc. 28 at 10]. Thus, the undersigned **RECOMMENDS** that the statements Chaidez made in response to these questions be **SUPPRESSED** from the government's case-in-chief at trial.

Nonetheless, the government argues that since the statements were voluntary, the physical fruits of that statement—the $60,000 in currency located in Chaidez's bedroom, where he said it was located—are not subject to suppression. The Court agrees. *United States v. Manta-Carillo*, 491 Fed. Appx. 125, 127 (11th Cir. Oct. 4, 2012) (holding that "the Self–Incrimination Clause in the Fifth Amendment does not bar the admission of physical evidence that is the fruit of an unwarned but voluntary statement") (citing *Jackson*, 506 F.3d at 1360-61, and *Patane*, 542 U.S. at 636, 645 (plurality opinion and Justice Kennedy's concurring opinion, respectively). As discussed below, Chaidez's statements while at 4135 Flat Shoals Road, while unwarned, were nonetheless voluntary.

Similar to the analysis employed in determining whether a consent to search is voluntary, the focus of the inquiry into the voluntariness of a post-arrest statement is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."

49

*Connelly*, 479 U.S. at 170 (citation omitted).  The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession.  *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); *see also United States v. Vallas*, 218 Fed. Appx. 877, 878-79 (11th Cir. Feb. 23, 2007).   This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.  *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *Gonzalez*, 71 F.3d at 828.  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ."  *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

Under this standard, Chaidez's statements in response to Hannan's questioning while in Chaidez's residence were voluntary.  Again, the record shows that Chaidez was intellectually able to make a voluntary choice.  Although he was in custody, his detention was not lengthy and he was being questioned in the presence of his family in his own living room.  The questioning was not lengthy or prolonged; in fact, the evidence only discloses two questions.  Other than the use of handcuffs, no physical force was used against him.  Nor were there any promises or inducements by police. Finally, Chaidez was cooperative with the police.

As a result, the undersigned **RECOMMENDS** that Chaidez's unwarned statements about the location and amount of currency in his home be **SUPPRESSED** from the government's case-in-chief at his trial, but that the physical fruits of his statements, *i.e.*, the currency located in his bedroom, **NOT BE SUPPRESSED**.

51

2.      *March 2013 statements*

The Court also concludes that Chaidez's statements to Ledgerwood and Reagan were lawfully obtained.

### a.      The March 2013 statements were not tainted by any illegal arrest or searches in November 2012

Chaidez's primary argument is that the unlawfulness of his November detention and searches tainted the March statements.  Since the Court had concluded that Chaidez was lawfully arrested and he and his residence was properly searched in November 2012, this argument is rejected.  Therefore, Chaidez's reliance on *United States v. Cordova*, 829 F. Supp. 2d 1342 (N.D. Ga. 2011), is misplaced.  In *Cordova*, Judge Duffey held that law enforcement's unlawful discovery of physical evidence was the proximate cause of their questioning the defendant, where the questioning was close in time to the unlawful search and the defendant was arrested based on the unlawfully discovered evidence.  *See id.* at 1348-53.  In the present case, however, the undersigned has concluded that no Fourth Amendment violation occurred in November 2012, and thus Chaidez's statements in March 2013 were not tainted by any unlawful searches.  Thus, *Cordova* offers no support for Chaidez.

52

Even if, for example, the cell phone search in November 2012 is found by the District Judge to have been unlawful, the March 2013 statements still would not be subject to suppression on a taint theory. Unlike in *Cordova*, where the questioning occurred within days of the unlawful seizures, in the present case, by the time he was questioned by the HSI agents, over three months had elapsed since Chaidez initially was arrested and his cell phone was searched, and thus any taint from the illegal search (if Chaidez was even aware of the search of his cell phone at the time) was dissipated. It also is significant to the Court that in *Cordova*, the arrest was based on the unlawfully seized evidence, while in this case, it is beyond peradventure that Chaidez was properly arrested for the firearm on November 30, 2012.

Similarly, even if the cell phone was unlawfully accessed on November 30, 2012, the federal agents were well aware of other, unquestionably lawfully seized evidence which would have prompted them to question Chaidez.  For example, as the above discussion reflects, the marijuana was properly discovered in his home.  Also, the keys he was carrying on November 29, 2012, were lawfully seized and tested in the locks of 4115 Flat Shoals Road.  Next, the telephone calls between Armenta and Chaidez were lawfully discovered when Armenta's telephone was searched pursuant to a warrant, although the number to Chaidez's cell phone would not have been known but for the

53

search on November 30.  Perhaps more significant, Chaidez was found in the backyard of 4115 Flat Shoals Road armed with a firearm with an obliterated serial number, and the row of seats missing from the vehicle at Chaidez's home was located at the residence where thirty pounds of methamphetamine were found.  Thus, even if there was some improperly seized evidence, it is more than likely that Chaidez would have been questioned anyway.

Finally, the evidence shows that Ledgerwood did not question Chaidez on the basis of the call log or contact list on his cell phone.  Rather, it was Chaidez, in an effort to be cooperative, who explained that a conspirator was identified on his cell phone by a nickname.  Thus, the search of Chaidez's cell phone, even if unlawful, did not taint or prompt his March 2013 statements.

> **b.     The March 2013 statements were not in violation of the timely presentment rule**

Chaidez argues that he was questioned by the HSI agents beyond the six-hour "safe harbor" provisions of 18 U.S.C. § 3501(c), as prohibited by the *McNabb/Mallory* Rule,[24] *United States v. Corley*, 556 U.S. 303, 309 (2009), 18 U.S.C. § 3501(c), and

---

[24]     In *McNabb v. United States*, 318 U.S. 332, 345 (1943), the Supreme Court invoked its supervisory authority over federal courts and held that confessions were inadmissible when obtained during unreasonable delay in bringing a prisoner before a magistrate ("presentment").  In *Mallory v. United States*, 354 U.S. 449, 455 (1957), the

AO 72A
(Rev.8/8
2)

Federal Rule of Criminal Procedure 5(a), and thus his March 6, 2013, statements must be suppressed.[25]  This contention is rejected, primarily because there is no evidence that Chaidez was questioned outside the six-hour limit imposed by *Corley*.  *See United States v. Brown*, 459 F.2d 319, 324 (5th Cir. 1971) (burden of proving a violation of Rule 5(a) is on the defendant); *United States v. Halbert*, 436 F.2d 1226, 1230, 1237 (9th Cir. 1970) (placing burden on defendant to show, pursuant to Rule 5(a), that a confession should be suppressed due to pre-arraignment delay).   Although the *Miranda* rights form and Reagan's notes of the interview demonstrate that the questioning began at 6:45 p.m. on March 6, 2013, Govt. Exs. 14, 16, there is no indication in the record of the time Reagan retrieved Chaidez from state or local custody.   Since the burden is on the defendant to establish at least a *prima facie* violation of the six-hour rule and he has failed to do so, this claim fails.

---

Court interpreted the then-current version of Federal rule of Criminal Procedure 5(a) and held that a confession given seven hours after arrest was inadmissible for "unnecessary delay" in presentment before a magistrate, where the police questioned him for hours "within the vicinity of numerous committing magistrates." Section 3501(c), imposing a six-hour rule, was enacted in 1968.  *United States v. Corley*, 556 U.S. 303, 309 (2009).

[25]      The Court notes that this ground for suppression was raised for the first time in Chaidez's post-evidentiary hearing brief and was not asserted in his initial motion.  [*See* Doc. 14].

Also, no violations of the *McNabb/Mallory* Rule, *Corley*, 18 U.S.C. § 3501(c) or Federal Rule of Criminal Procedure 5(a) occurred because at the time of Chaidez's questioning by Ledgerwood and Reagan, no federal charges for which Chaidez could have been presented to a United States Magistrate Judge were pending.  In *Corley*, the Supreme Court interpreted 18 U.S.C. § 3501(c), and held that

> a district court considering a motion to suppress a custodial statement "must find whether the defendant confessed within six hours of arrest (unless a longer delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate]').  If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and . . . the weight to be given [it] is left to the jury." . . .  If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.

*Corley*, 556 U.S. at 322 (citations omitted).

The Eleventh Circuit has held that defendants arrested for administrative immigration proceedings are not required to be presented to a magistrate judge pursuant to Rule 5(a).  *United States v. Noel*, 231 F.3d 833 (11th Cir. 2000).  In *Noel*, the defendant had been deported from the United States in 1997.  Thereafter, he illegally re-entered the United States and was convicted of state offenses.  While serving his state sentence, the Florida Department of Corrections notified the immigration

56

AO 72A
(Rev.8/8
2)

authorities that Noel was a deportable alien, and an immigration detainer was lodged against him.  Based upon this detainer, Noel was released into immigration custody to begin deportation proceedings on March 7, 1999.  On March 31, 1999, the immigration authorities confirmed his prior deportation and reinstated his earlier deportation order.  On April 15, 1999, a federal grand jury returned an indictment charging Noel with illegal re-entry following deportation.  He was arrested on April 22, 1999, and appeared before a magistrate judge that same day.  On appeal, defendant Noel contended that these actions violated his right to prompt presentment under Fed. R. Crim. P. 5(a), as well as other rights.  In rejecting Noel's challenge, the Eleventh Circuit expressly rejected the contention that his prompt presentment rights were triggered by the arrest on March 7 when the immigration officers took him into custody, holding that "detentions attendant to deportation proceedings are civil in nature; they do not implicate Rule 5(a), which only governs criminal arrests."  *Noel*, 231 F.3d at 837; *see also   United States v. Chavez*, 705 F.3d 381, 384 (8th Cir. 2013) ("Because immigration proceedings are civil, persons arrested under [8 U.S.C. ]§ 1357(a)(2) do not have the protections of Rule 5(a).)" (citations omitted)).  *But see United States v. Superville*, 40 F. Supp. 2d 672, 683 (D.V.I. 1999) (holding that § 3501(c) expressly applies to any federal detention, including immigration detentions).  The *Noel* Court

57

noted, however, that a contrary result might obtain if the detention was used by the government not to effectuate a deportation but as a ruse to detain the defendant for later criminal prosecution. *Noel*, 231 F.3d at 836.

Even if the Court was inclined to find support in the record for an ulterior motive in questioning Chaidez,[26] the record contains no evidence that Chaidez was questioned by the federal agents beginning more than six hours after he entered federal immigration custody. Thus, Chaidez's *Corley* argument is without merit.

### c.    There was no *Seibert* violation

Next, the Court does not find that Chaidez's questioning violated *Missouri v. Seibert*, 542 U.S. 600 (2004), as alleged by Chaidez. [Doc. 32 at 25 n.8]. In *Seibert*, a plurality opinion of the Supreme Court held that a conscious decision to use the "question-first" technique, where officers interrogate a suspect without warning of the right to remain silent until that interrogation produces a confession, then give the suspect *Miranda* warnings, and "lead [ ] the suspect to cover the same ground a second time," violates the Fifth Amendment. *Seibert*, 542 U.S. at 604, 617; *see also United States v. Street*, 472 F.3d 1298, 1313-14 (11ᵗʰ Cir. 2006). In determining whether the

---

[26]    For example, Ledgerwood testified that he asked Chaidez if he was willing to answer questions about his immigration status, but the bulk of the questioning concerned Chaidez's drug trafficking. *See* Govt. Exs. 15, 16.

58

law enforcement officers employed such a tactic, the Court must consider the totality of the circumstances, which includes: "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." *Id.* at 1314 (citation omitted).  The *Street* Court held that if an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the *Miranda* decision intended. *Id.* (citation omitted).  A "substantial break in time and circumstance between the prewarning statement and the *Miranda* warning" constitutes an appropriate curative measure.  *Id.* (quoting *Seibert*, 544 U.S. at 622 (Kennedy, J., concurring)).

Here, Chaidez's *Seibert* claim fails for a number of reasons.  First, there is no evidence of a "deliberate plan" to get Chaidez to confess without *Miranda* warnings and then question him following receipt and waiver of his *Miranda* warnings.  In fact, unlike the police in *Seibert*, there is no evidence that either HSI or Fulton County Sheriff's Office had an official policy of questioning suspects without first giving *Miranda* warnings and then obtaining a second statement after administering warnings.

59

*See Seibert*, 542 U.S. at 616.  The Court also notes that the initial questioning was not comprehensive such that it left "little, if anything, of incriminating potential left unsaid," *Seibert*, 542 U.S. at 616, which cuts against a finding of a deliberate plan.  The initial, un-*Mirandized* questioning in this case was limited to Chaidez's presence in the backyard of the first house being searched and the location and amount of any currency in his home, while the second interrogation focused on his involvement in marijuana trafficking, including his coconspirators, frequency of his receipt of marijuana, and the logistics of his marijuana transactions.

Second, even if a *Seibert* violation had been shown, there are sufficient measures demonstrated by the record to more than cure any violation.  These include that fact that a span of over three months occurred between the unwarned statements and the warned statements.  Also, the March questioning was conducted by different law enforcement officers and at a different location than the November questioning.  *See United States v. Hardy*, No. 4:08CR513 RWS, 2009 WL 1076173, at *7 (E.D. Mo. Apr. 21, 2009) (no *Seibert* violation where interviews were two months apart); *United States v. Libby*, No.  CRIM.04-26-B-W,  2004  WL  1701042,  at  *6  (D. Me.  July  30,  2004) (distinguishing *Seibert* where interrogations were separated by approximately twenty hours, change of location, and different questioning officers).  *Cf. United States v.*

60

*Aguilar*, 384 F.3d 520, 525 (8th Cir. 2004) (finding *Seibert* violation where two interrogations were not separated in time, occurred in the same interrogation room, and the same officers participated in the questioning).

As a result, Chaidez's arguments under *Seibert* are rejected.

### d.   Chaidez's March 2013 statements were in compliance with *Miranda* and voluntary

Finally, although Chaidez's post-hearing brief does not make any general claim that his March 2013 statements were in violation of *Miranda* or involuntary, the Court finds that they were in fact voluntary.  He was read his *Miranda* rights in Spanish and voluntarily waived them.

As to voluntariness, he was legally in custody as a result of his prior removal. He was not handcuffed during the interview.  He was provided water.  The interview was not unduly long.

Moreover, that the agents told him that they did not believe his initial denials of marijuana trafficking did not render his statements involuntary.  A confession is involuntary and subject to suppression when induced by such duress or coercion, express or implied, that the accused's "will has been overborne and his capacity for

61

self-determination critically impaired." *Schneckloth*, 412 U.S. at 225.  As the Fourth

Circuit noted in *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980):

> [I]t is important always to bear in mind that "the voluntariness of a confession cannot be equated to the absolute absence of intimidation," *Johnson v. Hall*, [ ] 605 F.2d 577, 582 n.8 [(1st Cir. 1977)], for "[u]nder such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind."

Thus in *United States v. Ballard*, 586 F.2d 1060 (5th Cir. 1978), the court stated:

> Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him "holding the bag" does not, as a matter of law, overcome a confessor's will . . . .  Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary.  . . . A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will.  Such an account may increase the chance that one detained will make a statement.  However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made. . . . [T]elling the appellant in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government.

*Id.* at 1063 (citations omitted); *see United States v. Vera*, 701 F.2d 1349, 1364

(11th Cir. 1983) (holding that "a mere admonition to the accused to tell the truth does

not render a confession involuntary"); *United States v. Barfield*, 507 F.2d 53, 56

62

(5th Cir. 1975) ("[A]n officer's admonition to tell the truth . . . does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."); *see also United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (pounding fist on the table while accusing defendant of lying does not negate voluntariness); *United States v. Bailey*, 979 F. Supp. 1315, 1318 (D. Kan. 1997) ("Merely exhorting [defendant] to start telling the truth did not render his confession involuntary."). Thus, the agents' pressing questions about Chaidez's involvement in marijuana trafficking, including telling him (falsely) that his conversations may have been intercepted, did not render his statements to Ledgerwood and Reagan involuntary. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that police's false statement to defendant that companion confessed insufficient to make otherwise voluntary statement involuntary); *Farley*, 607 F.3d at 1328 ("Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary," and noting that the falsehood would have to take the form of coercive threat, such as threatening to take defendant's children away or deception went directly to nature of suspect's rights and effect on waiving them) (citations omitted).

Therefore the undersigned **RECOMMENDS** that Chaidez's motion to suppress as to his March 6, 2013, statements be **DENIED**.

63

***Conclusion***

For all of the above reasons, the undersigned that Chaidez's motion to suppress evidence and statements, [Doc. 14], be **GRANTED** as to Chaidez's November 30, 2012, statements as to why he was in the backyard of 4115 Flat Shoals Road and as to the location of any currency in his residence and **DENIED** in all other respects.

The Court has now disposed of all motions referred to it and has not been advised of any impediment to setting a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 14th day of January 2014.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

64